<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **MILLIPORE CORPORATION, et al.** | : | |
| | : | **Civil Action No. 11-1453 (ES)** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **W.L. GORE ASSOCIATES, INC.,** | : | **OPINION** |
| | : | |
| **Defendant.** | : | |

<u>S</u>ALAS, <u>D</u>ISTRICT <u>J</u>UDGE

Presently before the Court is the parties' request for claim construction.  The Court held a *Markman* hearing on September 14, 2012. This opinion addresses the proper construction of the disputed claim terms.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

**I.     Background**

Plaintiffs Millipore Corporation, Millipore AB and Millipore SAS (collectively the "Plaintiffs" or "Millipore") bring this action against W.L. Gore Associates, Inc. ("Defendant" or "Gore") for patent infringement and breach of contract.  (*See generally* D.E. No. 1, Complaint ("Compl.")).  On August 24, 2004, the United States Patent and Trademark Office ("USPTO") issued United States Patent No. 6,779,575 (the "'575 Patent").  (Compl. ¶ 8).  On March 30, 2010, the USPTO reissued the '575 Patent as United States Reissue No. RE41,169 (the "'169 Reissue[1]" collectively with the '575 Patent (the "Patents")).  Millipore acquired the rights to the

---

[1] The Court notes that Claims 1 through 15 are identical in both the '575 Patent and '169 Reissue.  For ease of reference, the Court will cite to the '169 Reissue unless the language differs between the two patents.

'575 Patent through a merger with the NovaSeptum AB, NovAseptic AB and NovASeptic America, Inc. (the "NovAseptic Companies").  (*Id.* ¶¶ 34, 38).[2]

The '575 Patent and the '169 Reissue "disclose[ ] and claim [ ] a sealing appliance for mechanically sealing hollow hoses or elastic material."  (Compl. ¶ 13).   The "Sealing Appliance" was invented to assist in "satisfying all of the requirements for contamination-free transport" of sample containers, "which are filled with a medium," and then taken to a laboratory for analysis.  ('169 Reissue, 1:55-60).  The Sealing Appliance "is intended for contamination-free sealing and cutting of hoses that [connect a] conveying means [to] collecting vessels which are connected to the process container, so that the collecting vessels, after being filled with a medium from the process container, can be moved without any risk of contamination to a laboratory for analysis or sampling of the medium."  (*Id.* at 1:32-42).

The Sealing Appliance achieves a clean separation.  Specifically, the hose that connects the vessel containing the beverage and the sample container is placed between the jaws of the Sealing Appliance.  ('169 Reissue, 4:51-62).  When actuated, the Sealing Appliance uses straight bars (located on the upper jaw) to reinforce the sealing of the hose, and to fix a sleeve on the hose, and a cutting means, which has a substantially straight cutting edge, to make a cutting indication in the hose and sleeve for the necessary separation.  (*Id.*).

Generally, Millipore alleges that Gore is making, using, selling, offering to sell or importing sealing devices that infringe upon the '575 Patent and '169 Reissue.  (Compl. ¶ 14).  Millipore filed the instant Complaint[3] on March 15, 2011, and moved simultaneously for a

_____

[2] Prior to the instant litigation, on October 28, 2005, the NovAseptic Companies filed a complaint against Amesil, Inc. to enforce the '575 Patent.  (Compl. ¶ 15).  The NovAseptic Companies alleged that Amesil infringed the '575 Patent by manufacturing and selling a cutting and crimping device.  (*Id.*).  The parties to that action ultimately settled the matter and entered into a settlement agreement in February 2007 (the "Settlement Agreement").  (*Id.* ¶ 16).  Gore later acquired Amesil and continued its business.  (*Id.* ¶ 27).
[3] Millipore's Complaint contains two causes of action.  In Count I, Millipore alleges that Gore is making, using, selling, offering for sale, or importing into the United States of America a crimping device that has infringed and is

preliminary injunction.  (*See* D.E. Nos. 1 and 4).  The Court denied the request for a preliminary injunction on November 9, 2011.  (D.E. No. 34).

Pursuant to Local Patent Rule 4.3, on October 19, 2011, the parties submitted their joint claim construction and prehearing statement.  (D.E. No. 32, "Joint Claim Construction Br.").  On December 15, 2011, the parties filed their opening *Markman* briefs and related declarations and attachments.  (D.E. No. 38, "Gore Opening"; D.E. No. 39 "Millipore Opening").  On February 8, 2012, the parties filed their responsive briefs.  (D.E. No. 42, "Gore Response"; D.E. No. 43, "Millipore Response").  On September 14, 2012, the Court held a *Markman* hearing to facilitate the Court's construction of the disputed claim terms.

## II.    Legal Standard

Claim construction is a matter of law to be determined solely by the court.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312, 1330 (Fed. Cir. 2005).  "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Id.* (quotations omitted).  In construing the terms of a patent, a court should look first to the language of the claim itself.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The terms in the claim "are generally given their ordinary and customary meaning."  *Id.*  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Phillips*, 415 F.3d at 1313.  A court "must look at the ordinary meaning in the context of the written description and the prosecution history."  *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).  The court should turn to "those sources available to the public that show what a person of skill in the art

---

infringing one or more claims of the '575 Patent and '169 Reissue.  (Compl. ¶¶ 45-46).    In Count II, Millipore alleges that Gore breached the Settlement Agreement by making, using selling, offering for sale or importing crimping devices that infringe the Patents.  (Id. ¶ 55).

would have understood disputed claim language to mean." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

To this end, the court should first examine the intrinsic record—the patent itself, including the claims, the specification, and the prosecution history. *Vitronics*, 90 F.3d at 1582 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). The specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* Indeed, the Federal Circuit explains that the specification is "'usually . . . dispositive . . . [and] the single best guide [for] the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). It is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317. The specification is also an important guide in claim construction because it may contain "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 1316.

Additionally, the court should consult the patent's prosecution history because it "provides evidence of how the [USPTO] and the inventor understood the patent." *Id.* at 1317. The prosecution history is the complete record of the proceedings before the USPTO and includes the prior art cited by the patentee during examination of the patent. *Id.* Moreover, the prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* Indeed, the Federal Circuit has repeatedly emphasized the need to consult the prosecution history to "exclude any interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (quotations omitted).

A district court may also examine extrinsic evidence—*i.e.*, "all evidence external to the patent and prosecution history." *Markman*, 52 F.3d at 980; *see also Phillips*, 415 F.3d at 1317-18 ("[The Federal Circuit] ha[s] authorized district courts to rely on extrinsic evidence . . . ."). Extrinsic evidence consists of testimony by the inventor or by experts, dictionaries, and treatises. *Markman*, 52 F.3d at 980.  In particular, a court may find reference to technical dictionaries useful "in determining the meaning of particular terminology . . . ." *Phillips*, 415 F.3d at 1318. However, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of disputed claim language." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quotation omitted).

## III.    The Disputed Claim Terms

### A.   Reference Characters in Claim Language

As an initial matter, Millipore and Gore disagree as to whether the Court should include the reference characters noted in the claims when they appear within the terms to be construed. Nonetheless, the parties agree that the reference characters have no special effect on claim scope. (Millipore Opening, *passim*; Gore Response 5).  Accordingly, the Court will not consider them in its analysis.  For completeness, however, the Court will leave the reference characters in when referencing the disputed terms.[4]

### B.   "cutting means (13)"

The term "cutting means (13)" appears in Claims 1-3 of the '169 Reissue and the '575 Patent and in Claim 31 of the '169 Reissue.  Gore contends that the Court need not construe this term because Claim 1 defines the structure, function and location of the cutting means.  (Gore

---

[4] The Court notes that the parties also disagree about whether the jury should be instructed to ignore the reference characters.  The Court decided at oral argument that this issue is properly raised at the *in limine* stage.  The Court's decision to include the reference numbers in this opinion will have no bearing on that issue.  (Transcript dated September 14, 2012 ("Tr.") 18:9 to 11).

Opening 29-30).  Millipore asserts that the phrase should be construed as "a means that makes a cutting indication in the sleeve and the hose to allow a sealing cutting of the hose."  (Millipore Opening 13).   In support, Millipore argues that the proposed construction is supported by the language of the claims and specification.  (*Id.*).

The Court agrees with Gore and finds that the term, "cutting means (13)," does not need to be construed because the plain and ordinary meaning of the term is apparent.  The Court bases its ruling on the plain language of the claim.  Moreover, the Court finds that Millipore's proposed construction does not improve over the "readily apparent" meaning of the term. *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.") (citation omitted).

First, Claim 1 of the '575 Patent and the '169 Reissue and Claim 31 of the '169 Reissue define the structure of the cutting means as the "form of a substantially straight cutting edge (15) which projects to a greater extent than the projecting end of said at least one bar (11)."  ('169 Reissue, 4:61 to 64, 8:18 to 21).  Second, Claim 1 defines the function of the cutting means indicating that it "makes a cutting indication (14) in the sleeve (4) and the hose (2) to allow a sealing cutting of the hose" and Claim 31 states that the cutting means "makes a cutting indication (14) in the sealing means (3) and the hose (2) to allow a sealing cutting of the hose (2)."  (*Id.* 4:59 to 61, 8:16 to 18).  Finally, Claim 1 of the '169 Reissue and '575 Patent and Claim 31 of the '169 Reissue define the location of the cutting means as being located on one of the jaws.  (*Id.* 4:56 to 57, 8:13 to 14).

6

Millipore's proposed construction effectively mirrors the language already set forth in the claims.   ('169 Reissue, 4:59 to 61).   Importantly, it would also broaden the language of the claims by ignoring the claimed language in Claim 31 of the '169 Reissue.   Therefore, the Court declines to adopt Millipore's proposed construction and finds that the term does not need to be construed because the plain and ordinary meaning is "readily apparent."

### C.   "cutting indication (14)"

"Cutting indication" is found in Claims 1 and 2 of the '575 Patent and the '169 Reissue and Claim 31 of the '169 Reissue.   Millipore contends that the "cutting indication (14)" should mean "an indication allowing a sealed cutting of the hose either directly at the time the cutting indication is made or at an optional point of time after that using manual or mechanical bending back and forth until the sleeve is divided by fatigue fracture."   (Millipore Opening 7-8).   Gore contends that the term should means "a partial or full cut."   (Gore Opening 22).   The Court adopts Gore's proposed definition and construes the claim term "cutting indication (14)" to mean "a partial or full cut."   (Gore Opening 22).   The Court bases its ruling on the language in the claims, specification and prosecution history.

Millipore argues that the plain language of the claims do not limit the cutting indication to a particular form.   (*Id.* at 8).   Millipore contends that the cutting indication could be a recess, a groove or other deformation of the hose so long as it allows a sealing cutting of the hose.   (*Id.*).   Therefore, Millipore argues that the cutting indication is not necessarily a cut.   (*Id.*).   Instead, the cutting indication must only indent enough to allow a sealing cutting of the hose.   (*Id.*).   Millipore also contends that the patentee acted as its own lexicographer by setting forth details about the cutting indication in the specification.   (Tr. 44:4 to 13).

Gore argues that Millipore's proposed construction reads out the term "cutting." (Gore Opening 22). Gore also contends that it adds ambiguity by using undefined terms such as "optional point of time," "manual or mechanical bending back and forth," and "fatigue fracture." (*Id.* at 23). Gore relies upon the specification and the prosecution history to support its proposed construction. Gore argues that the cutting indication must involve some cutting and should be distinguished from crimping, i.e. a mere indentation. Gore relies upon Figures 5A and 5B of the '169 Reissue to demonstrate that the cutting indication is substantial enough that it results in either a partial or a full cut of the hose. (Gore Opening 23-24;'169 Reissue, 3:61-63). Gore also argues that the prosecution history demonstrates that the NovAseptic Companies understood that a cutting indication requires the ability to make an actual cut and requires more than compressing and deforming. (Gore Opening 24).

The Court agrees with Gore and finds that Millipore's proposed construction effectively reads out the word "cutting" from the term. The language of the claims and specification demonstrate that the patentee sought to distinguish between a "cut" and a "recess or groove." For example, Claims 1 and 31 utilize the term "crimp" and "indentation" as distinguished from the cutting indication. ('169 Reissue 4:47, 4:54, 8:3, 8:9). In Claim 1, the patentee describes how the "jaws *crimp* the sealing means against the hose to seal the same" and how the jaws make an "*indentation*" when "at least one of the jaws is moving towards the other jaw." (*Id.*) (emphasis added). This is distinguishable from the language of Claim 1 describing how the cutting means makes a "cutting indication." (*Id.* 4:57 to 59). If the cutting indication is merely a crimp, recess, impression or indentation as Millipore argues, the Court finds that the patentee would have utilized the term "crimp" or "indentation" as it did in other parts of the claims.

Figures 5A and 5B in the specification of the '169 Reissue also demonstrate the patentee's intent to distinguish between an indentation, crimp or recess and the cutting indication.  In the figures, there is a clear delineation between an indentation at reference number 12 and the cutting indication at reference number 14.  Once again, Millipore has not adequately explained why the patentee chose to describe the cutting indication differently than the indentation if the two were meant to be synonymous.

The Court also finds that the language in the specification supports the Court's finding stating, in relevant part, that

> The cutting indication 14 mentioned above is preferably such that the sleeve 4 and the hose 2 are not cut or broken directly when sealing by means of the appliance 1, such as shown in FIG. 5A, but at an optional point of time after that.  Then the sleeve 4 and the hose 2 are separated along the cutting indication 14 by manual or mechanical bending back and forth, until the sleeve is divided by fatigue fracture, as shown in FIG. 5B.  Naturally, nothing prevents the sleeve 4 and the hose 2 from being separated along the cutting indication 14 directly in connection with the actual sealing.

('169 Reissue, 3:53-63).

While the specification states that it is preferable that "the sleeve 4 and the hose 2 are not cut or broken directly," it also states that the sleeve and hose can be "separated along the cutting indication 14 by manual or mechanical bending back and forth . . . ."  (*Id.* at 3:54 to 55, 3:57 to 59).  The specification suggests that the cutting indication must be more than the indentation, groove or recess Millipore argues it is.  Millipore did not articulate to the Court how the sleeve and hose could be separated by manual or mechanical bending back and forth if there was not some form of partial cut.  Millipore merely states that there must be "enough of an impression into the sleeve … so that at an optional point in time later you can bend back and forth and it will

come about."  (Tr. 50:24 to 51:3).  The Court declines to adopt such a broad reading of the specification.

The next sentence in the specification further supports this Court's construction.  The specification states that even though the hose can be separated manually, "nothing prevents the sleeve 4 and the hose 2 from being separated along the cutting indication 14 directly in connection with the actual sealing." ('169 Reissue, 3:61-63).  Millipore was unable to explain to the Court how a separation could occur in connection with the sealing if the cutting indication did not make a "cut." (Tr. 51:19 to 52:2).  Instead, Millipore argued that this language in the specification was included to cover the possibility of a device that directly severs.  (*Id.*).  The Court finds no support in the claim or specification language for Millipore's assertion.  The specification does not indicate any scenario where the "cutting indication" is merely a "groove" or an "indentation."  Instead, the plain language of the claim and the guidance from the specification lead this Court to conclude that the separation contemplated by the Patents must either be a "partial or full cut."  If nothing exists to prevent the sleeve and hose from separating along the cutting indication, the Court cannot envision, nor could Millipore explain, how the cutting indication is not a "partial or full cut."

The Court notes that the specification explains that Figures 5A and 5B "are side views which show the sealed hose, partially cut open, in a position after sealing and in a position after completed cutting of the hose." ('169 Reissue, 2:32 to 34).  While Millipore argues that the term "partially cut open" is a term of art used only to describe the cross sectional view of the figures, the Court finds no support in the specification for this argument.  (Millipore Response 9, Tr. 44:22 to 46:8).  Instead, the Court finds that the description of Figures 5A and 5B are further

support that the cutting indication must be substantial enough to result in a partial or full cut and not merely an indentation.

Finally, the prosecution history also supports the Court's construction.  In the applicant's response to the USPTO dated December 4, 2000 (the "Response"), the applicant sought to distinguish "cutting" from the act of "crimping" based on the prior art in *Pfaff and Owens*.  (*See* D.E. No. 38-1, Declaration of Christopher J. Burrell ("Burrell Decl."), Ex. I).  The applicant stated that "[t]he present, non-obvious invention … makes a sealing crimp on a metal sleeve 4 on either side of a cutting means which *severs* the metal sleeve into two, separated, end sealed sections." (*Id.* at 4) (emphasis added).  The applicant went on to state that its invention for a sealing appliance is distinguished from *Pfaff* because *Pfaff* has "no cutting means whatsoever." (*Id.*).  Instead, the patentee argued that *Pfaff* contemplated a "ridge portion 34 for compressing and deforming." (*Id.*).  Importantly, the applicant noted that "[i]f ridge portion 34 in fact had a cutting ability it would *sever* the clip member 16 rather than merely compressing and deforming it…" (*Id.*).  The applicant made clear in the Response that the cutting means (which, as noted in Claims 1 and 31, makes the cutting indication ('169 Reissue, 4:57 to 59, 8:13 to 16)) severs the metal sleeve.  The applicant went on to define "cutting functionality" as a "severing rather than a crimping." (Burrell Decl., Ex. I at 4).   This further supports the Court's construction as the Court finds that the applicant intended to demonstrate that the cutting means makes a cut of some kind.  Therefore, the Court construes the cutting indication to mean "a partial or full cut."

**D.  "a substantially straight cutting edge (15)"**

The parties disagree about the term the Court must construe.  Millipore contends that the terms "substantially straight" and "cutting edge" should be construed separately while Gore contends that the terms should be construed together as "a substantially straight cutting edge

(15)." (Millipore Opening 14; Gore Opening 11).  Millipore contends that the term "cutting edge" should mean "an edge of the cutting means" and substantially straight should mean "substantially without bend or curve."  (Millipore Opening 14, 17).  Gore, on the other hand, states that "a substantially straight cutting edge" should mean "a sharp edge oriented substantially parallel to the surface of the associated jaw."  (Gore Opening 11).

The Court construes the terms separately because the term "cutting edge" appears in multiple places in the claims without the modifier "substantially straight."  The term "cutting edge" is found in the '169 Reissue and the '575 Patent in Claims 1, 3, 7-10, 12, 13, 15 and in the '169 Reissue at Claim 31.  The term "substantially straight" as a modified by "cutting edge" is found in the '169 Reissue and the '575 Patent in Claims 1 and 3 and in the '169 Patent in Claim 31.  At oral argument Gore agreed with the Court that it would be proper to construe the terms separately.  (Tr. 72:2 to 8).

The Court declines to construe the term "substantially straight" because the plain and ordinary meaning is apparent.   The Court bases its construction on the plain language of the claim.  Neither party's proposed construction improves over the "readily apparent" meaning of the term nor have the parties demonstrated how the term is in dispute.  *See Phillips*, 415 F.3d at 1314.  Moreover, at oral argument Millipore agreed that the term need not be construed.  (Tr. 69:22 to 23).  The term "substantially" is a term of degree and the term "straight" would be understood by a typical juror.  *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.") (citation omitted).  Therefore, the Court will not construe the term "substantially straight."

The Court will construe the term "cutting edge" to mean "an edge capable of making a partial or full cut."  The claims describe the cutting means as having "the form of a substantially straight cutting edge."  ('169 Reissue, 4:61 to 62).  As previously noted, the claims state that the cutting means makes the cutting indication.  (*Id.* 4:57 to 59; 8:13 to 16).  Therefore, the Court will look to its previous analysis of the "cutting indication" to construe the "cutting edge."  (*See* Section III.C *supra*).  Because the Court construed the cutting indication as a "partial or full cut," the cutting edge must therefore be capable of making a partial of full cut.  As set forth in greater detail in Section III.C related to the cutting indication, the Court's construction of "cutting edge" is supported by the language in the Patents and the prosecution history.

Gore argues that its proposed construction is appropriate because the word "cutting" modifies "edge" so it must "allow for or facilitate actual cutting." (Gore's Opening 11-12).  Gore also contends that the claim language uses the terms "cutting" and "crimp" demonstrating the applicant's intent that the term "cut" is distinguishable from "crimp."  Therefore, Gore argues that the cutting edge must be "sharp" that so it may actually cut.  (*Id.*).   Gore also points this Court to the following language in the specification "nothing prevents the sleeve 4 and the hose 2 from being separated along the cutting indication 14 directly in connection with the actual sealing."  ('169 Reissue, 3:61-63).  Finally, Gore again argues that the applicant's use of the word "sever" to refer to the cutting means in the prosecution history is further evidence that the cutting edge must be "sharp."  (Gore Response 15).  While the Court agrees with Gore's underlying theory, the Court is troubled by the inclusion of the word "sharp" in the proposed definition.  The Court did not find, nor did Gore demonstrate, any textual support in the '169 Reissue or the '575 Patent to support that the cutting edge must be sharp. (Tr. 71:3 to 6).  At oral

argument, counsel for Gore conceded this point and agreed to the Court's proposed construction. (Tr. 73:12 to 16).

In support of its proposed construction, Millipore relies upon the language of the claims, the specification and expert testimony. The Court finds that Millipore's proposed construction, "an edge of the cutting means," essentially reads the word "cutting" out of the term. In doing so, the Court finds that the proposed construction would broaden the scope of the term to include edges that may not be able to cut. Moreover, Millipore's proposed construction does not add any information to assist a trier of fact because it merely deletes the term "cutting" from the language in the claims. Finally, Millipore's expert, Dr. Samir Nayfeh, explained that one of ordinary skill in the art would understand an "edge" to be "a line formed at the intersection of two surfaces." (Nayfeh Decl. ¶ 8). The Court finds that Dr. Nayfeh's testimony does not assist this Court because Dr. Nayfeh opined as to the definition of the term "edge" and not "cutting edge." (Burrell Decl., Exhibit P 56:12-57:06, 72:22-6). Without considering the modifier "cutting," Dr. Nayfeh's testimony does not give the Court a complete picture.

Therefore, the Court finds that "substantially straight" will have its plain and ordinary meaning and construes "cutting edge" as "an edge capable of making a partial or full cut."

**E.   "to allow a sealing cutting of the hose (2)"**

Millipore contends the disputed term should be "allow a sealing cutting" and Gore contends the disputed term should be "to allow a sealing cutting of the hose (2)." (Millipore Opening 10; Gore Opening 25). The term is found in Claim 1 of the '169 Patent and the '575 Patent and Claim 31 of the '169 Patent. The Court will construe Gore's suggested term, rather than Millipore's partial phrase, because it properly includes the entire phrase as written in the

patents.  *See Hockerson-Halberstadt, Inc. v. Converse, Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999).

Millipore proposes that the Court should construe the term to mean "create the conditions for a sealed cutting of the hose either directly or at an optional point of time after the cutting indication is made using manual or mechanical bending back and forth until the sleeve is divided by fatigue fracture."  (Millipore Opening 10).  Gore suggests that the Court define the term to be "while maintaining a seal in the hose as the hose is fully cut or separated."  (Gore Opening 25).  The Court construes "to allow a sealing cutting of the hose (2)" to mean "maintaining a seal in the hose as the hose is partially or fully separated."  At oral argument Gore agreed to this construction.  (Tr. 80:2 to 3).  The court bases its ruling on the plain language of the claims and the specification.

Millipore argues that the plain language of the claims and the specification support its proposed construction.  (Millipore Opening 10).  Millipore proffers that the specification sets forth two preferred embodiments.  In the first embodiment, the hose is cut after the cutting indication is made.  In the second, the hose is cut at the time the cutting indication is made.  ('169 Reissue, 3:53-63).  Therefore, Millipore argues that to "allow a sealed cutting" must mean the sealed cutting occurs directly or at an optional point in time after the cutting indication is made.  (Millipore Opening 10-11).  On the other hand, Gore argues that its interpretation is consistent with the objective of the patent to maintain a contamination free environment while crimping and cutting.  Gore contends that if a seal were not required during the entire time the hose was being cut or separated then the sample, the vessel or the environment could become contaminated.  (Gore Opening 25).

The Court finds that neither of the proposed constructions are appropriate.   Gore's proposal to use the term "while" narrows the claim too much.   Nothing in the claim or the specification requires the sealing to occur while the cutting indication happens.   In fact, the claim merely states that the cutting indication is there to "to *allow* a sealing cutting," but does not say when the sealing cutting happens.   ('169 Reissue, 4:60 to 61, 8:17 to 18) (emphasis added).   Millipore's construction is too broad because it does not take into account that a seal must be maintained at all times or that the Court has defined the cutting indication as a "partial or full cut."   Millipore conceded this at oral argument.   (Tr. 75:17 to 18).   As such, the Court's construction takes into account the word "allow" in the claim language and is consistent with the Court's prior construction of the term "cutting indication."   The construction is also supported by the language in the specification extensively quoted by the Court in its analysis of "cutting indication."   ('169 Reissue, 3:53-63) (noting that "nothing prevents the sleeve 4 and the hose 2 from being separated along the cutting indication 14 directly in connection with the actual sealing").

Therefore, the Court construes "to allow a sealing cutting of the hose (2)" to mean "maintaining a seal in the hose as the hose is partially or fully separated."

### F.   "that at least one of the jaws (8 or 9) <u>has</u> a cutting means"

Millipore contends the disputed term should be "has" and Gore contends the disputed term should be "that at least one of the jaws (8 or 9) has a cutting means (13)."   (Millipore Opening 18; Gore Opening 18).   Millipore limits the term to the third occurrence of "has" as found in Claim 1 of the '169 Reissue and the '575 Patent and the second occurrence of "has" in Claim 31 of the '169 Reissue.   (Millipore Opening 18-19).   Gore's proposed term is found in Claim 1 of the '169 Patent and the '575 Patent and in Claim 31 of the '169 Patent.

16

The Court will construe the entire phrase "that at least one of the jaws (8 or 9) has a cutting means (13)" and not just the word "has."  *See Hockerson-Halberstadt, Inc.*, 183 F.3d at 1374.   The Court construes "that at least one of the jaws (8 or 9) has a cutting means (13)" as "the cutting means is mounted on, made in one piece with, or connected to at least one of the jaws."   The Court bases its ruling on the plain language of the claims and the specification.

Millipore argues that the term "has" should be construed to mean "is associated with." (Millipore Opening 19).   In support, Millipore points to the specification which states that "[t]he bars 11, the cutting edge 15 and the fixture 17 can be mounted on the associated jaw 8, 9…" (Millipore Opening 19 (citing '169 Reissue 4:8-9)).   The specification also states that "[a]lternatively, one/some of or all these components can be made in one piece with the ***associated*** jaw."   (*Id.* citing '169 Reissue 4:11-12) (emphasis added).   Millipore notes that the components are merely associated with a jaw and there is no requirement in the language of the claims or specification that the "cutting edge" be mounted directly on the jaw.   (Millipore Opening 19).

Gore contends that the term "that at least one of the jaws (8 or 9) has a cutting means (13)" should mean "that at least of the jaws (8 or 9) includes a cutting means (13) that is either mounted on or made in one piece with the associated jaw."   (Gore Opening 18).   Gore argues that in the language of the claim, the cutting means must be a part of one of the jaws because it makes a cutting indication when the jaws are moved towards each other.   (Gore Opening 19). Gore also argues that the specification notes that the cutting edge can be mounted or made into one piece with the associated jaw using a suitable attachment means.   (Gore Opening 20 (citing '169 Reissue 4:4-12)).   Gore contends that Millipore's construction is too broad to be supported by the language of the claims because "if the cutting means were not mounted on or made in one

17

piece with one of the jaws, there would be no assurance that a cutting indication would necessarily be made *when* the jaws are brought together, as the claims require.  (Gore Response 21) (emphasis in original).  Therefore, Gore argues that its proposed construction follows the guidance from the specification.  (Gore Opening 20).

Millipore argues that Gore's proposed construction is too narrow because there is no requirement in either the claims or the specification that the cutting means be mounted directly on the jaw.   (Millipore Opening 19).  Instead, Millipore argues that the specification gives an example of one embodiment where the cutting edge *can* be mounted on the associated jaw. (Millipore Response 22).  Millipore contends that Gore's proposed construction violates the principles set forth in *Phillips* because it "seeks to read into the claims a limitation from only one of many possible embodiments of the claimed invention."  (*Id.*).

The Court starts its analysis with the plain language of Claim 1.  Claim 1 states, in relevant part, "that at least one of the jaws (8 or 9) *has* a cutting means (13), which projects towards the other jaw (9 or 8)…"  ('169 Reissue 4:56 to 58) (emphasis added).  The Court finds that Millipore's proposed construction is broader than what is contemplated by the claim language.  By using the term "has," the claim contemplates more than just an association between the cutting means and one of the jaws.  It necessarily implies that it is connected in some way.

The dependent claims also support this Court's construction.  For example, Claim 4 states that "at least one of the jaws (8 or 9) has a fixture (17) … the bars (11) and the cutting edge (15) are situated on one jaw (8) and that the fixture (17) is situated on the other jaw (9), the bars, the cutting edge and the fixture being mounted on or being ma[d]e in one piece with the associated jaw . . . ."  ('169 Reissue 5:17 to 24).  Claim 7 states "[a]n appliance … characterized in that the

18

at least two bars (11) and the cutting edge (15) are situated on one jaw (8), and that the fixture

(17) is situated on the other jaw (9), at the least one bar, the cutting edge and the fixture being

mounted on or being ma[d]e in one piece with the associated jaw."  (*Id.* 5:62 to 67).  The Court

gleans from the language of the independent claim and the dependent claims that "has" means

more than just "associated with."  Finally, in the Abstract, the patentee states the patent is for

> An appliance for sealing elastic hoses with a sleeve, which is
> plastically deformable and slipped onto the hose, has two jaws
> which are movable towards and away from each other.  One jaw
> has two straight bars which project towards the other jaw and
> extend transversely of the sleeve to make two transverse
> indentations in the sleeve and the hose when the jaws are moving
> towards each other.  The same jaw *has* a cutting edge which
> projects towards the other jaw and is directed transversely of the
> sleeve, the cutting edge making a substantially transverse cutting
> indication in the sleeve and the hose when the jaws are moving
> towards each other.

('169 Reissue, Abstract) (emphasis added).   Once again, the Court notes that the term "has" is

not as broad as "associated with."

In support of its position, Millipore has referred this Court to the specification.  The

Court, however, believes that Millipore seeks to broaden the claims based on the language in the

specification, which the Court declines to do.   The Court finds no support in any of the claim

language for Millipore's proposed construction and will not utilize the specification to broaden

the plain language of the claims.  *See McClain v. Ortmayer*, 141 U.S. 419, 424 (1891) ("The

claim is the measure of his right to relief, and while the specification may be referred to to limit

the claim, it can never be made available to expand it.").

Finally, the Court notes that, despite Millipore's argument, the Court has not run afoul of

the doctrine of claim differentiation.  *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438

F.3d 1374, 1380 (Fed. Cir. 2006) ("Claim differentiation refers to the presumption that an

independent claim should not be construed as requiring a limitation added by a dependent claim.") (citations omitted).  The Court recognizes that it is constrained from utilizing dependent claims to narrow an independent claim.  *See id.*  Instead, the Court is using the dependent claims to understand the meaning of the word "has."  *See Philips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005) ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of the claim term.").

Therefore, the Court construes "that at least one of the jaws (8 or 9) has a cutting means (13)" as "the cutting means is mounted on, made in one piece with, or connected to at least one of the jaws."

**G.** **"projects to a greater extent that the projecting end of said at least one bar (11)" and "projects to a greater extent than the projecting end of the at least two straight bars (11)"**

The Court will construe these two claim terms together because the analysis for both is the same.  "Projects to a greater extent that the projecting end of said at least one bar (11)" is found in Claim 1 of the '169 Reissue and the '575 Patent and Claim 31 of the '169 Reissue. "Projects to a greater extent than the projecting end of the at least two straight bars (11)" is found in Claim 3 of the '169 Reissue and the '575 Patent.

Millipore proposes that the terms should be construed as "projects past the projecting end of said at least one bar" and "projects to a greater extent than the projecting end of the at least two straight bars" respectively.  (Millipore Opening 20, 22).  Millipore supports its argument utilizing the plain language of the claims.  (*Id.* at 21).  Gore argues that the terms should be construed as "lies at a greater distance from the surface of the associated jaw as mounted on or made with the jaw than the distance between the end of the straight bar and the surface of the jaw" and "lies at a greater distance from the surface of the associated jaw as mounted on or made

20

with the jaw than the distance between the ends of the at least two straight bars and the surface of the jaw." (Gore Opening 21). Gore proposed this language because it believes that Millipore's proposed construction for the previous term "has" is ambiguous. (*Id.*). Therefore, Gore seeks to utilize this term to help clarify the ambiguity.

The Court agrees with Millipore and finds that the term "projects to a greater extent that the projecting end of said at least one bar (11)" means "projects past the projecting end of said at least one bar." Logically, the Court also finds that term "projects to a greater extent than the projecting end of the at least two straight bars (11)" means "projects past the projecting ends of the at least two straight bars." The Court finds that these constructions are supported by the plain language of the claims. The Court did not find any textual support in the claims or specification for Gore's proposed construction. Moreover, Gore agreed with the Court that utilizing the word "past" to define "to a greater extent" would be logical and supported by the text of the claims. (Tr. 114:6 to 8, 115:17 to 20).

### H. "crimp", "indentation" and "sealing means"

Gore seeks for the Court to construe "crimp," "indentation" and "sealing means." "Crimp" is found in Claim 1 of '169 Reissue and the '575 Patent and Claim 31 of the '169 Reissue. "Indentation" is found in Claims 1 and 2 of the '169 Reissue and the '575 Patent. Finally, "sealing means" is found in Claim 31 of the '169 Reissue.

Millipore argued that the Court does not need to construe the terms "crimp," "indentation" and "sealing means." (Millipore Opening 24-25). Millipore contends that the Court need not construe either "crimp" or "indentation" because it would not aid in understanding a disputed limitation. (*Id.* at 24). Millipore also argues that the Court does not need to construe "sealing means" because the claims already define it. (*Id.* at 25). Initially,

Gore disagreed with Millipore and asked for construction by the Court.  (Gore Opening 26-29).

At oral argument, however, Gore conceded that if the Court defines "cutting indication" as Gore

proposes, Gore would no longer be seeking the Court to construe "crimp," "indentation" and

"sealing means."  (Tr. 117:12 to 20).  Because the Court construed the term "cutting indication"

in line with Gore's proposal, these terms are no longer in dispute.

## IV.     Conclusion

For the reasons set forth above, the disputed terms at issue will be construed as indicated.

An appropriate Order shall accompany this Opinion.


                                                    _/s/ Esther Salas_____

Dated: October 24, 2012                             **Esther Salas, U.S.D.J.**